**Clem LOVELL and Cash Lovell, Appellants,**

**v.**

**R. H. HAMMOND et al., Appellees.**

Court of Appeals of Kentucky.

May 12, 1967.

Cole & Cole, Barbourville, for appellants.

Don B. Mills, Barbourville, for appellees.

PALMORE, Judge.

The only question in this case is whether the evidence was sufficient to support a judgment awarding the appellees, R. H. Hammond and wife, partners doing business as R. H. Hammond Company, recovery of an automobile and various sums of money against the appellants, Clem Lovell and Cash Lovell.

In 1961 Hammond, a resident of Florida, bought a farm in Knox County, Kentucky. For some years he had engaged in the show horse business, though not as a breeder. At the suggestion of his trainer, Clem Lovell, he purchased a number of horses and, together with Clem and his brother Cash Lovell, thereafter operated a training farm on the property. Clem and Cash drew salaries of $100 and $90 per week, respectively, and were to receive 60% of all profits realized from the sale of horses. The venture came to an end in November of 1963, and this lawsuit mainly represents the unraveled portion of it.

The chancellor found on the basis of substantial evidence that there were no profits. That finding is not now contested. He found also that there was no settlement of accounts, as claimed by the Lovells, under which Hammond agreed to let them

have the automobile in question and a certain brown mare. The unassailability of that finding also is conceded. He further found that there was no agreement that stud fees and boarding fees were to be divided equally between the Lovells and the Hammonds, or that a horse or horses belonging to Cash were to be boarded free of charge, and in these respects the arguments are now directed to the figures as distinguished from the existence or non-existence of the agreements.

All of the expenses of the operation were paid by the Hammonds and, according to Hammond, all receipts were to be remitted to him regularly at his home in Florida. The largest item in controversy on this appeal is the amount of $3765 adjudged against the Lovell brothers jointly for boarding fees and stud fees. By Clem's admission the only money ever turned over to Hammond out of boarding fees received was one remittance of $1050, so the problem here boils down to finding evidentiary substantiation for the receipt of $4815 by the Lovells for boarding and stud fees.

Clem testified during the trial that in 1963 they boarded nine horses—two for eight months, two for seven months, two for three and a half months, two for one month, and one for four months; and that they charged $100 per month for the two horses that stayed seven months, $100 per month for the one that stayed four months, and $125 per month for the rest. As we compute the total boarding charges from his testimony, they were as follows:

| | |
|---|---|
| 2 x 8 x $125 – | $2000 |
| 2 x 7 x $100 – | 1400 |
| 2 x 3½ x $125 – | 875 |
| 2 x 1 x $125 – | 250 |
| 1 x 4 x $100 – | 400 |
| Total | $4925 |

During the course of the trial the chancellor questioned Clem Lovell as follows:

Q- "This board bill. I'd like to ask Mr. Clem Lovell this one question. The

board bill for these horses, is any of it outstanding at this time?"

A- "Yes, one of them is."

Q- "How much?"

A- "Three hundred dollars."

Clem also had testified to the receipt of $290 in stud fees that had not been remitted to Hammond.

Recapitulating to this point, it seems utterly clear to us that the evidence supports a finding that the Lovells actually received $4625 in boarding fees ($4925 less $300) and $290 in stud fees, totalling $4915, out of which Hammond was paid only $1050, leaving a balance of $3865. Hence the award of $3765 reflects a mathematical error of $100 in favor of the Lovells.

The remaining amounts awarded were as follows:

(1) $420 against Cash for feeding his own horses (one for seven months and another for 14 months).

(2) $200 against Clem in payment of a loan.

(3) $735 against Clem in payment for household items purchased for him by Hammond as a loan.

■ As to the first of these latter three items, Hammond testified that "Cash brought in a horse—bought a horse in '62 and kept it there about seven months * * * and didn't * * * pay any feed bill or pay any labor on it," etc. The only other evidence of the length of time Cash kept a horse of his own on the place was the testimony of Cash himself, as follows: "I had a horse when I first hired out to Mr. Hammond * * * and I brought it with me, and then I sold the horse and purchased another one several months later." "How many months all together did you have one or the other of the horses there on the farm?" "I came to work for Mr. Ham-

mond in September and the horse came with me, and I sold him in November. Then I bought the other horse the following August, I believe. Then I had the mare approximately seven months, I think, and sold her."

The testimony of Cash in this respect is consistent with that of Hammond, but we do not perceive any basis for the finding that one of the horses was kept for 14 months. The horse or mare bought in August after the first horse had been sold the previous November is bound to have been purchased in 1962, as Hammond said, in order to have been kept on the place for seven months, because the venture ended in November of 1963. Thus the first horse must have been sold in November of 1961 after having been boarded on the farm for only two months. So we have one animal for two months and another for seven, totalling nine. At the rate allowed by the chancellor, $20 per month (supported by Hammond's testimony that "feed should have run around $30 a month), recovery against Cash individually should have been fixed at $180 rather than $420.

■ The remaining two items are clearly supported by the evidence. Actually they are not related to the partnership operation, but were pleaded as separate claims in an amended complaint. In February of 1960 the Hammonds gave Clem Lovell's landlord a $200 check marked "Rent for Clem Lovell to Apl. 1/60." Hammond testified it was a loan made at Clem's request. Clem denied it. That is all there is to it. The $735 allowance was for kitchen equipment purchased by Hammond for a house then occupied by Clem. Hammond said Clem promised to repay him when he sold a car. Clem admitted the expenditure and receipt of the goods so purchased, but denied any promise to reimburse Hammond. Again, this is but one man's word against another's, and it borders on the frivolous to insist that there is no substantial evidence in support of the chancellor's finding.

All of the facts mentioned in this opinion were derived from the transcript of evidence heard by the chancellor and the advisory jury, without reference to the pretrial depositions filed but not read to the jury. It is therefore unnecessary to discuss whether the depositions are properly a part of the record under review.

The judgment should be modified to increase the award against Clem and Cash Lovell by $100 and to reduce the award against Cash Lovell individually to $180. As so modified, it is affirmed.

All concur.